UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| DOLLAR LOAN CENTER OF SOUTH DAKOTA, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> BRET AFDAHL,[1] <br><br> Defendant. | 3:17-CV-03024-RAL <br><br> OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS, GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND DENYING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT |

Plaintiff Dollar Loan Center of South Dakota, LLC (DLC) brought this suit under 42 U.S.C. § 1983 against Defendant Bret Afdahl (Afdahl), the director of the South Dakota Division of Banking, alleging Afdahl deprived DLC of procedural due process required under the Fourteenth Amendment when he revoked DLC's money lending licenses. Doc. 1. Afdahl moved to dismiss the action for failure to state a claim, Doc. 8, DLC moved for partial summary judgment, Doc. 11, and Afdahl filed a cross motion for summary judgment, Doc. 19. For the reasons stated below, this Court denies Afdahl's motion to dismiss, denies Afdahl's cross motion for summary judgment, and grants in part DLC's motion for partial summary judgment.

---

[1] DLC initially filed this action against "Brett Afdahl, individually and in his official capacity as director of the South Dakota Division of Banking." Doc. 1. The correct spelling of Afdahl's name is Bret, and DLC concedes that because it is only seeking money damages, the only cognizable claim is against Afdahl in his individual capacity. See Doc. 14 at 6 n.3.

## I.    Factual Background

The South Dakota Division of Banking (Division), an agency within the South Dakota Department of Labor and Regulation, is charged with the supervision and control of activities set forth in SDCL chapter 51A (Banks and Banking). Doc. 21 at ¶¶ 10–11. Afdahl is the director of the Division. Doc. 21 at ¶ 9; Doc. 29 at ¶ 4. As director, Afdahl has authority with respect to entities holding money lending licenses, such as investigations and examinations of business records and accounts, and has powers over licenses themselves including issuing cease and desist orders, approval or denial of applications and renewals, and authority to revoke or suspend in certain circumstances. Doc. 21 at ¶ 13; Doc. 29 at ¶ 5. See SDCL §§ 54-4-41–57.

DLC applied for a money lender's license under SDCL chapter 54-4 in 2010. Doc. 21 at ¶ 14; Doc. 29 at ¶ 7; Doc. 22-2. DLC's initial application indicated it would not provide short-term consumer loans as defined under South Dakota law.[2] Doc. 21 at ¶ 15; Doc. 22-2. The Division issued a license to DLC, MYL2840, which is considered DLC's main license. Doc. 21 at ¶¶ 16–17; Doc. 29 at ¶ 7. DLC submitted several renewal applications for its lending license, and applied for additional licenses to open branches in different communities in South Dakota. No renewal application or license application indicated that DLC would provide short-term loans, or that DLC was making any substantive change to its loan products (with the exception in 2012 of a change from a 52 week to a 65 week amortized loan product). Doc. 21 at ¶¶ 18–36; Docs. 22-3, 22-4, 22-5, 22-6, 22-7, 22-8, 22-9. DLC historically made high interest loans at rates exceeding 300 percent per annum and had successfully expanded to twelve locations across South Dakota.

---

[2] South Dakota law defines a short-term loan as "any loan to any individual borrower with a duration of six months or less, including a payday loan." SDCL § 54-4-36(16).

Largely to target the lending practices of DLC, Initiated Measure 21 (IM 21) was placed on the South Dakota ballot in 2016 to set a usury rate cap in South Dakota.

South Dakota voters on November 8, 2016, passed IM 21 to set a maximum finance charge for money lenders licensed under SDCL chapter 54-4. Doc. 21 at ¶¶ 1–2; Doc. 29 at ¶ 1. IM 21 prohibits all money lenders licensed under SDCL chapter 54-4 from making a loan that imposes total interest, fees, and charges at an annual percentage rate (APR) greater than 36 percent, or from evading that rate limitation by indirect means. [3] Doc. 21 at ¶¶ 3–4. Following the passage of IM 21, the South Dakota Legislature passed House Bill 1090 during the 2017 Legislative Session which added a new section to Chapter 54-4 which instructed that "late fees, return check fees, and

---

[3] IM 21, which became law on November 16, 2016, amended SDCL chapter 54-4 as follows:

> After procuring such license from the Division of Banking, the licensee may engage in the business of making loans and may contract for and receive interest charges and other fees at rates, amounts, and terms as agreed to by the parties which may be included in the principal balance of the loan and specified in the contract. However, no licensee may contract for or receive finance charges pursuant to a loan in excess of an annual rate of thirty-six percent, including all charges for any ancillary product or service and any other charge or fee incident to the extension of credit. A violation of this section is a Class 1 misdemeanor. Any loan made in violation of this section is void and uncollectible as to any principal, fee, interest, or charge.

SDCL § 54-4-44.

> No person may engage in any device, subterfuge, or pretense to evade the requirements of § 54-4-44, including, but not limited to, making loans disguised as a personal property sale and leaseback transaction; disguising loan proceeds as a cash rebate for the pretextual installment sale of goods or services; or making, offering, assisting, or arranging a debtor to obtain a loan with a greater rate of interest, consideration, or charge than is permitted by this chapter through any method including mail, telephone, internet, or any electronic means regardless of whether the person has a physical location in the state. Notwithstanding any other provision of this chapter, a violation of this section is subject to penalties in § 54-4-44.

SDCL § 54-4-44.1.

attorney's fees incurred upon consumer default are not fees 'incident to the extension of credit.'"
SDCL § 54-4-44.3.

DLC did not seek renewal of eight branch licenses. Doc. 21 at ¶ 37. Because DLC's then existing loan product offered interest rates that exceeded 36 percent, DLC could no longer originate that product after IM 21 went into effect in November of 2016. See Doc. 21 at ¶¶ 153–163. DLC still held a main office license for its location at 921 West 10th Street in Sioux Falls and four branch licenses for locations in Rapid City, Aberdeen, Watertown, and Sioux Falls. Doc. 21 at ¶ 38; Doc. 29 at ¶ 6.

DLC advised the Division on June 21, 2017, that it would begin making loans using a new loan contract that differed from those previously disclosed to the Division. Doc. 21 at ¶ 42; Doc. 29 at ¶ 10. DLC counsel Sander Morehead (Morehead) provided a blank copy of the updated loan contract and advised the Division that DLC planned to begin making the loans sometime after July 1, 2017. Doc. 21 at ¶ 43; Doc. 29 at ¶ 10. On June 22, 2017, Division counsel Brock Jensen (Jensen) emailed Morehead and acknowledged receipt of the letter and blank loan contract, and requested a copy of the current loan contract which was to be replaced. Doc. 21 at ¶¶ 47–49; Doc. 29 at ¶ 10.

In a letter from Jensen to Morehead dated July 7, 2017, Jensen expressed the Division's concern regarding the proposed signature loan product. The letter reads as follows:

> Dear Mr. Morehead:
>
> The South Dakota Division of Banking (Division) received and reviewed your letter with attachment dated June 21, 2017. In your letter, you indicate that your client, Dollar Loan Center South Dakota, LLC (DLC), intends to begin making loans with an updated loan contract sometime after July 1, 2017, after some recent amendments to SDCL Chapter 54-4 go into effect. Specifically, it appears that DLC's new loan contracts attempt to take advantage of a provision of House Bill 1090 (HB1090) that provides that late fees are not "incident to the extension of credit."

> Please note that SDCL 54-4-44.1 provides the following regarding the manipulation of fees to avoid the application of the requirements of SDCL 54-4-44:
>
> [text of SDCL § 54-4-44.1 omitted but included herein, supra note 2]
>
> Prior to receiving your June 21 letter, it was the Division's understanding that DLC would not originate, renew, or roll over any new loans after the provisions of Initiated Measure 21 became effective on November 16, 2016. As such, it appears that DLC may intend to use the late fee provision in the new loan contracts as a "device, subterfuge, or pretense to evade the requirements of § 54-4-44."
>
> It is the position of the Division that any effort to exploit the very limited exemptions provided in HB 1090, in order to engage in high cost consumer lending, will not be permitted. Please consider this letter to be notice that the Division intends to conduct a full examination of DLC within the next thirty days in order to more fully understand the actions and intent of DLC in this matter.
>
> If you have any questions or need more information, please feel free to contact this office. Thanks.

Doc. 22-13. In response, Morehead replied in a letter dated July 12, 2017, that DLC would fully cooperate with the examination and "has not and has no intention of violating SDCL Chapter 54-4." Doc. 22-14 at 1.

The Division conducted a target examination on July 13, 2017, at the DLC office in Sioux Falls, South Dakota, where the operations of the Sioux Falls branch and the Rapid City branch of DLC were examined. Doc. 21 at ¶¶ 53, 57, 58; Doc. 29 at ¶ 14. DLC Regional Manager Beau Fritts (Fritts) and DLC's outside counsel, attorney Justin Smith (Smith), were present for the target examination. Doc. 21 at ¶ 61; Doc. 29 at ¶ 14. Fritts provided the examiners with a copy of DLC's South Dakota Operations Training Manual (OTM) along with access to DLC's loan software system known as Infinity. Doc. 21 at ¶ 63; Doc. 29 at ¶ 14. Fritts provided the examiners with a brief tutorial on how to navigate the Infinity software, and an examiner provided Fritts and Smith with a list of requested items and reports needed for the examination. Doc. 21 at ¶¶ 69–70; Doc.

29 at ¶ 14. The examiners reviewed several loans, read through the OTM, and received several of the requested items from Smith. Doc. 21 at ¶¶ 71–72, 75; Doc. 29 at ¶ 14, 16. At approximately 1:30 p.m., the examiners asked to meet with Fritts and Smith to make further inquiries after reviewing the selection of loans. Doc. 21 at ¶ 76; Doc. 29 at ¶ 14. The examiners reviewed the request list with Fritts and Smith and inquired about items that were still outstanding. Doc. 21 at ¶ 77; Doc. 29 at ¶ 14. The examiners communicated a desire for reports that would present a "more high-level overview" on the performance of the new loans. Doc. 21 at ¶¶ 79, 81; Doc. 29 at ¶ 17. Fritts explained that the examiners already had reports which included information on each loan originated, and that no reports existed at that time matching the criteria sought by the examiners. Doc. 21 at ¶¶ 79, 80, 81, 82; Doc. 29 at ¶ 17.

The Division determined after the target examination that additional information and a larger loan sample were needed to complete the examination of DLC. Doc. 21 at ¶ 84; Doc. 29 at ¶ 19. At the time of the target examination, DLC's new loan product was 10 days old and only 27 loans had reached their seven day maturity period.[4] Doc. 21 at ¶ 85, 87. The Division found that of those 27 loans, 16 were past due. Doc. 21 at ¶ 87. On July 18, 2017, the Division sent an email to Fritts with a list of follow-up questions requesting a response as soon as possible. Doc. 21 at ¶ 88; Doc. 29 at ¶ 19. There were six questions, some with subparts, which requested certain information about the signature loan product and lending practices of DLC:

> 1.    The New Signature Loan Product that DLC began offering on July 3, 2017 (Signature Loan) has an APR that is capped at 36%, which is the same as the interest rate cap on active military members through the Military Lending Act (MLA). Does DLC offer Signature Loans to active military members?
>
>    a.    Does the Signature Loan comply with the MLA?

---

[4] The seven day maturity period on the loan would appear to make the loan product contrary to DLC's application and renewal applications disavowing that it makes short term consumer loans.

b. If the Signature Loan complies with the MLA but is not currently offered to active military, please provide your reasoning for this.

2.     Based on the contents of the Operations Training Manual (OTM), applicants' income is one of the key criteria in determining whether to approve a loan. On Page 18 of the OTM, "Gets paid weekly or bi-weekly" is listed as a "Pro-Positive risk factors that strengthen an application." If a borrower only get [sic] paid bi-weekly, but the loans mature in seven days, why is this a "Pro" instead of a negative factor?

3.     On 17 of the 20 loans we reviewed, we noted that the borrowers didn't get paid until after the loan was scheduled to mature. Does management currently track this information?

i. If a DLC employee/manager notes that the applicant isn't scheduled to get paid until after the loan matures, are they required to perform additional due diligence on how the applicant intends to repay the loan by the contractual due date?

4.     According to reports provided to the examiners, DLC approved/funded 27 loans from July 1-July 5th. Sixteen of those 27 loans (59.25%) were past due as of July 13th (no other loans originated could have been past due on July 13th due to the standard seven day loan term). This equates to 17.77% (16 of 90) of the total number of all loans outstanding being past due. This is substantially higher than the 1.37% of loans past due that was reported in the Statement of Loan Activity in DLC's 2017 Money Lender Renewal Application for South Dakota. What do you attribute this significantly higher rate of past due loans to?

5.     The loan Agreement states that DLC "may report information concerning performance of this Agreement to one or more consumer reporting agencies. Late payments, missed payments, or other defaults may be reflected in Borrower's credit report". Does DLC currently, or at any time in the past, report late payments, missed payments or other defaults to any credit reporting agencies?

6.     Is there a level of loan volume where DLC can be profitable offering Signature Loans on only interest collected (no late fees)?

a.     Has there been any analysis done regarding this?
i. If so, please provide documentation of this, or a description of the analysis if it was not documented.
b.     Is there a level of past due fees needed in order to be profitable?

Doc. 1-3.

DLC through Morehead responded to the inquiries on July 26, 2017, with relatively brief responses. Doc. 1-4; Doc. 22-18. In that response letter, Morehead made clear that DLC had

concerns that the Division sought information that went beyond the scope of the target examination, namely the legality of DLC's signature loan product. Doc. 1-4 at 1; Doc. 22-18 at 1.

The Division replied to DLC's response on August 10, 2017, stating that it deemed DLC's responses to the July 18, 2017, questions as "incomplete and unresponsive." Doc. 22-19 at 1. The Division also viewed DLC's purported failure to provide complete and responsive answers to Division questions as a "refusal of the money lender to permit the Director to make an examination" pursuant to South Dakota law, and that such a refusal would constitute "good cause" for the Director to take action against the licenses of that lender pursuant to SDCL § 54-4-49.[5] Doc. 22-19 at 1. The Division requested detailed and complete answers to the previously submitted questions and provided notice that a full scope examination of DLC would commence at the Sioux Falls location beginning at 9:00 A.M. on August 17, 2017. Doc. 22-19 at 1–2.

Morehead, on behalf of DLC, responded to the Division on August 15, 2017, and disputed that DLC had not been fully responsive to all aspects of the target examination, including the July 18, 2017 questions. Doc. 22-20 at 1. Morehead nevertheless provided further responses of DLC to the interrogatories, including a lengthy legal analysis arguing that the late fees associated with DLC's signature loan product were "bona fide" late fees, and thus not in violation of SDCL § 54-4-44.1's proscription against the use of "any device, subterfuge, or pretense to evade the requirements of § 54-4-44." Doc. 22-20 at 2–6. Morehead indicated that this analysis was being provided in part because of the Division's earlier concern that the late fees associated with the signature loan product constituted a means of evading the 36 percent APR limitation, and further stated that "DLC assumes this is at least one reason the Division has taken such an interest in the

---

[5] SDCL § 54-4-49 provides the Director with the authority to "condition, deny, decline to renew, suspend for a period not to exceed six months, or revoke a license for good cause pursuant to chapters 1-26 and 1-26D."

Signature Loan Product, and will now conduct a second examination in a little over 30 days' time, after conducting few, if any, during DLC's first seven years of operation." Doc 22-20 at 2.

The full scope examination took place on August 17 and 18, 2017, at DLC's Sioux Falls location where Fritts and Smith were once again present. Doc. 21 at ¶ 105; Doc. 29 at ¶ 25. The examiners determined that DLC originated 633 loans from July 1 to August 17, and selected 308 of those loans for examination. Doc. 21 at ¶¶ 106–07. In examining DLC's Payments Report covering July 1 to August 17, the examiners found that late fees paid by DLC customers totaled $10,050.00 and interest paid was only $1,091.81. Doc. 21 at ¶ 126. The examiners ultimately concluded that the late fees associated with DLC's signature loan product were "anticipated late payments" which they believed were not excluded from finance charge calculations under Regulation Z.[6] Doc 21 at ¶ 132. When these payments were included in the finance charge, the examiners determined the APR of DLC's signature loan product ranged from 350.83 percent to 487.64 percent, depending on the loan amount. Doc. 21 at ¶ 139. The Report of Examination (ROE) submitted to Afdahl included a finding that DLC's signature loan product violated SDCL § 54-4-44 because the APR exceeded 36 percent. Doc 21 at ¶ 149. Apart from examination of the loans, the Division considered the OTM from 2011 which dealt with DLC's old signature loan product—a very high interest loan with a term of 52 weeks that was later changed to a term of 65 weeks, which DLC could no longer offer after IM 21 went into effect—and compared it to the new OTM which dealt with DLC's new signature loan product. The comparison of these OTM's

---

[6] Regulation Z (Reg. Z) is a federal regulation promulgated under the Federal Truth in Lending Act which states in part that charges for actual unanticipated late payments are excluded from the finance charge. 12 CFR § 1026.4(c)(2). It is the Division's position that because Reg. Z does not say that anticipated late payments are excluded from the finance charge calculation, these payments must be included. Doc. 21 at ¶ 132. DLC disputes the Division's interpretation of Reg. Z, and provided its legal argument to the Division previously in its August 15, 2017 letter. Doc. 22-20 at 9–10.

revealed that DLC did not alter the criteria used in the loan decision processes after it began offering the new signature loan product. The Division further determined that the high delinquency rate of the new signature loan product generated a seven percent weekly late fee, much as the old signature loan product generated a seven percent weekly interest fee, and these factors contributed to the Division's conclusion that the late fees associated with DLC's new signature loan product were "anticipated" and subject to the interest charge calculation. Doc. 21 at ¶¶ 153–182.

On September 13, 2017, Afdahl issued Order No. 2017-2, a Cease and Desist and License Revocation Order (Order). Doc. 10-1 at 7–12. The Order instructed DLC to "cease engaging in the business of money lending in South Dakota" and to notify all consumers who were issued loans after June 21, 2017, that the loans were void and uncollectible as to "any principal, fee, interest, or charge pursuant to SDCL 54-4-44." Doc. 10-1 at 11. The Order further required DLC to surrender all of its South Dakota money lender licenses and return them to the Division. Doc. 10-1 at 11. The Order contained a "Findings of Fact" section, a "Conclusions of Law" section, and a notice that "any person aggrieved by this order" could within 30 days file a request for a hearing before the South Dakota Banking Commission. Doc. 10-1 at 8–12. Among the findings of fact, Afdahl determined that the APR for DLC's signature loan product ranged from 300.86 percent to 487.64 percent, that DLC was not licensed by the Division to originate and service "short term consumer loans" but only loans with maturities longer than six months, and that DLC's signature loan product was designed to incur late fees. Doc. 10-1 at 9. In his conclusions of law, Afdahl determined that DLC was engaging in practices that violated SDCL chapter 54-4 by providing short term consumer loans and offering a loan product that was in practice a "device subterfuge, or pretense to evade the requirements of SDCL 54-4-44." Doc. 10-1 at 10. Afdahl further

concluded that he had good cause to revoke DLC's money lending licenses because DLC had "violated statutes related to consumer credit, engaged in unfair practices involving lending activity," and found that the license applications submitted by DLC were "materially incomplete" and contained statements which were "false or misleading with respect to material facts." Doc. 10-1 at 10–11. Afdahl also issued a "Statement from the Division of Banking on Dollar Loan Center" informing the public that the Order revoked all money lending licenses held by DLC because its practices had been found to violate South Dakota law. Doc. 21 at ¶ 191; Doc. 22-23.

The Division emailed Morehead on September 15 and 18, 2017, inquiring as to whether DLC was in compliance with the Order. Doc. 1-7; Doc. 1-8. On September 15, counsel for the Division expressed a belief that DLC was continuing to service loans and emphasized that DLC was no longer a licensed money lender pursuant to the Order and was required to cease all lending activity. Doc. 1-7. On September 18, counsel for the Division asked Morehead for confirmation that DLC was complying with the Order. Doc. 1-8.

DLC filed this action on September 21, 2017, Doc. 1, and served Afdahl on September 25, 2017, Doc. 5. Afdahl issued a limited stay (Stay) of the Order on September 28, 2017, which provided that DLC could continue servicing all loans originated prior to November 16, 2016. Doc 10-1 at 14–15. DLC was to provide to the Division a list of all unpaid loans originated prior to November 16, 2016, identifying whether those loans had been turned over to a third party for collection or if a civil action had been commenced to seek collection, as well as basic identifying information about the loan and the borrower. Doc. 10-1 at 14–15. DLC was further instructed to provide a monthly detailed payment report to the Division showing all loan payments received by DLC during the preceding month. Doc. 10-1 at 15.

On October 3, 2017, the Division served DLC with a Notice of Hearing to be held on October 17, 2017, in front of the Office of Hearing Examiners (OHE). Doc. 10-1 at 1–5. The Notice indicated the purpose of the hearing was "to determine whether Dollar Loan Center has violated the provisions of SDCL Chapter 54-4, and whether or not its money lending license should be revoked and the terms and conditions as contained in the [Order] should be enforced." Doc. 10-1 at 1. The practical effect of the Stay and subsequent Notice of Hearing was to transform the Order revoking DLC's lending licenses into a cease and desist order with a hearing on whether there was cause to revoke DLC's licenses and whether the Order would be enforceable. DLC on October 5, 2017, requested to continue the hearing, though no specific date was proposed. Doc. 10-6 at 2. On October 12, 2017, DLC filed an appeal of the Order in the South Dakota Sixth Judicial Circuit Court, arguing that it constituted a final agency action.[7] Doc. 10-2.

## II.     Motion to Dismiss

Afdahl initially argued in support of his motion to dismiss that the 11th Amendment bars actions against Afdahl in his official capacity, that he was entitled to absolute immunity in his individual capacity for carrying out quasi-judicial functions, that DLC had failed to exhaust its administrative remedies, and finally that Younger abstention was warranted here to allow for ongoing administrative proceedings to play out. Doc. 9 at 9–15. DLC concedes that its only claim against Afdahl is in his individual capacity, thus the 11th Amendment argument does not bar the claim. Afdahl subsequently withdrew his argument that DLC failed to exhaust administrative remedies and, upon learning that DLC would not amend its complaint to seek declaratory relief, argued only briefly that abstention might be proper here to allow state proceedings to conclude.

---

[7] That appeal, 32 CIV 17-217, apparently was dismissed by the Sixth Judicial Circuit Court, and DLC is now appealing that decision to the Supreme Court of South Dakota, Appeal No. 28538.

Therefore, the primary issue remaining with respect to Afdahl's motion to dismiss is the question of absolute immunity.

## A. Absolute Immunity

Executive branch officials are typically entitled only to qualified immunity. <u>Freeman v. Blair</u>, 793 F.2d 166, 171 (8th Cir. 1986) [hereinafter <u>Freeman I</u>] (vacated in part by <u>Blair v. Freeman</u>, 483 U.S. 1014 (1987)). "This is so whether the suit is one against federal officials . . . or one against state officials." <u>Id.</u> However, there are "exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business." <u>Buser v. Raymond</u>, 476 F.3d 565, 568 (8th Cir. 2007) (quoting <u>Butz v. Economou</u>, 438 U.S. 478, 507 (1978)). Such "exceptional situations" arise when executive agency officials "functionally serve in capacities comparable to judges, prosecutors and jurors." <u>Id.</u> (citation and quotation marks omitted). "Thus, officials performing quasi-judicial actions are entitled to absolute immunity." <u>Id.</u>

The Supreme Court in <u>Butz</u> addressed the question of when agency officials acting in a similar role to that of prosecutors are entitled to absolute immunity. The Court explained that "[t]he decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution. An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought." <u>Id.</u> at 515. Without absolute immunity for these functions, executive officials' exercise of discretion "might be distorted" because of "a serious danger that the decision to authorize proceedings will provoke a retaliatory response." <u>Id.</u> Moreover, legal remedies available in such proceedings "provide sufficient checks on agency zeal" because a defendant may challenge the legality of the proceeding, present evidence to an impartial

trier of fact and obtain independent judgment as to whether the prosecution is justified, and bring to the courts claims that the proceedings are unconstitutional. Id. at 516.

The Eighth Circuit in Freeman I dealt with the application of absolute immunity to executive branch officials in a case analogous to the situation presented here. As a matter of procedural background, Freeman I was vacated by the Supreme Court in Blair v. Freeman, 483 U.S. 1014 (1987), and remanded to the Eighth Circuit. In Freeman v. Blair, 862 F.2d 1330 (8th Cir. 1988) [hereinafter Freeman II], the Eighth Circuit reinstated the portions of Freeman I regarding absolute immunity and procedural due process. These reinstated portions of Freeman I are binding precedent in this Court. Freeman I involved the suspension of a campground license on two separate occasions by two different secretaries of the South Dakota Department of Health. 793 F.2d at 169–70. On each occasion, the plaintiffs had refused to allow state officials to inspect their campground without a warrant, and on each occasion the secretary of the Department of Health invoked a state law allowing for the summary suspension of an entity's license upon determination of the existence of a hazardous condition. Id. The plaintiffs sued under 42 U.S.C. § 1983, alleging the state actor defendants had deprived them of their constitutional rights under the Fourth and Fourteenth Amendments.[8] The defendants argued they were entitled to absolute and qualified immunity. Id.

In rejecting absolute immunity for the defendants, the Eighth Circuit in Freeman I discussed the Supreme Court's decision in Butz regarding the applicability of absolute immunity to agency officials acting in a prosecutorial role. Freeman I, 793 F.2d at 171. The Eighth Circuit

---

[8] The Eighth Circuit's determination that state officials had violated clearly established law by attempting to inspect the campground without a warrant prompted the Supreme Court to vacate Freeman I. Thus the defendants ultimately were entitled to qualified immunity on the alleged Fourth Amendment violation. Freeman II, 862 F.2d at 1331–32.

evaluated whether the defendants were entitled to absolute immunity for both their decision to inspect the plaintiffs' campground without a warrant and the suspension of the plaintiffs' license. As to the decision to inspect without a warrant, absolute immunity was rejected as such actions "were not attended by any of the characteristics normally associated with the judicial process." Id. Regarding the decision to suspend the plaintiffs' license, the Eighth Circuit stated "[a]lthough we normally would view the license suspension as the initiation of administrative proceedings entitling [defendants] to absolute immunity, we believe that other considerations counsel that absolute immunity is not warranted in these circumstances." Id. at 172. In arriving at this determination, the Eighth Circuit noted that absolute immunity is extended when the protected conduct is "related closely to the immunity's justifying purposes." Id. (quoting Nixon v. Fitzgerald, 457 U.S. 731, 755 (1982)). The purposes for such immunity in the prosecutorial context are "found in the desire to insure that the prosecutor may exercise his office with the vigor required to assure the public good[,] . . . the desire to prevent the injustice of subjecting to liability public officials who must exercise some discretion because of the legal obligations of their positions[,]" as well as "to forestall the serious danger that a decision to authorize proceedings will provoke a retaliatory response." Id. (internal citations and alterations omitted). However, the Eighth Circuit did not believe the extension of immunity to the defendants in Freeman I would further these underlying purposes: In particular, the Eighth Circuit deemed absolute immunity improper because the initiation of administrative proceedings flowed from the defendants' improper initial conduct (attempting to search the campground without a warrant). Id. The Eighth Circuit noted that the defendants in Butz had engaged in conduct that was proper on its face and were thus entitled to absolute immunity. In contrast, the initial actions of the defendants in Freeman I that led to the initiation of administrative proceedings were improper, and in such a case

where an offical "knew or should have known" of the impropriety of their actions, absolute immunity was not justified. Id.

DLC argues that Freeman I closes the door on Afdahl's claim that he is entitled to absolute immunity because Afdahl, like the defendants in that case, engaged in investigative functions and then immediately revoked DLC's licenses before initiating administrative proceedings or giving DLC a hearing. Doc. 14 at 9. However, the facts in Freeman I are materially different than what the Division and Afdahl did here. In Freeman I, the defendants sought to inspect the plaintiffs' campground without a warrant on two separate occasions, and immediately suspended the plaintiffs' license when they were denied access to carry out that inspection. In doing so, the defendants invoked a law that allowed for such a suspension upon the determination of the existence of a hazardous condition. However, the defendants lacked a basis to find a hazardous condition because the defendants did not actually inspect the campground before suspending the license. Thus, the Eighth Circuit held that extending absolute immunity would not promote the underlying purposes of the immunity because "the initial actions taken by defendants were improper and therefore cannot justify the remainder of their actions." 793 F.2d at 172. An executive branch official, therefore, would not be impeded from the "vigorous exercise of his office for proper purposes in the future" if absolute immunity was not extended to the defendants in that case. Id. Moreover, it would be justifiable to subject an official to liability for actions which flowed from initial conduct that the official "knew or should have known . . . [was] clearly improper." Id.

In contrast, Afdahl's initial actions here were proper; South Dakota law grants Afdahl and the Division the authority to examine business records and accounts of license holders.[9] The

---

[9] SDCL § 54-4-57 provides:

Division, under Afdahl's direction, conducted a target examination on July 13, 2017, in Sioux Falls and then a full scope examination on August 17 and 18, 2017. The Division reviewed loans, the OTM, and reports given to them by DLC; asked questions on sight of Fritts and Smith; and requested follow-up information by letter after the target examination. The information properly gathered by the Division led Afdahl to conclude that DLC was violating South Dakota law, and his findings of fact and conclusions of law were laid out in the Order. Doc. 10-1 at 7–11. Among his conclusions of law, Afdahl determined that DLC was originating and servicing short term loans which DLC was not licensed to do, and that the late fees associated with these loans violated SDCL § 54-4-44.1, which prohibits the use of any "device, subterfuge, or pretense to evade the requirements of [South Dakota's interest rate cap of 36 percent]." Because of these findings, Afdahl concluded that he had good cause to revoke DLC's money lending licenses.

This is the point at which Afdahl committed procedural error. Section 54-4-49 authorizes Afdahl to revoke a money lender's license for good cause, but it must be done in conformity with South Dakota's Administrative Procedures and Rules, codified at SDCL chapter 1-26. Under that chapter, no license is to be suspended or revoked before the licensee is notified by mail "of facts or conduct which warrant the intended action, and the licensee [is] given an opportunity to show

---

The division may annually, or as often as the director considers necessary, conduct an examination of business records and accounts of any licensee licensed under this chapter. The director may charge back to the licensee any cost associated with an on-site examination. The director may waive an on-site examination and only require an annual self-examination. If a licensee conducts a self-examination, the licensee shall provide any information requested under oath and on forms provided by the division by order or rule. The provisions of § 51A-2-35 apply to records and examination reports required under this chapter.

compliance with all lawful requirements for the retention of the license."[10] SDCL 1-26-29. That same law also allows for the summary suspension of a license pending proceedings if Afdahl determined "public health, safety, or welfare imperatively require emergency action" and such findings are incorporated in the order. Id. Afdahl did not incorporate such findings in the Order, but did include a notice that DLC was entitled to a hearing to contest its terms. Doc. 10-1 at 12. Additionally, Afdahl argues (though in the context of his cross motion for summary judgment and not in support of his motion to dismiss) that quick action was necessary because DLC was violating the law, a predeprivation hearing was not practicable because it would allow DLC to continue originating illegal loans, and post-deprivation procedures were available. Doc. 20 at 21.

Afdahl's actions, therefore, are more of a mirror image to those of the defendants in Freeman I, rather than being identical as DLC suggests. Afdahl's initial conduct from which the decision to revoke DLC's licenses flowed was completely proper, but Afdahl's choice to revoke[11] the licenses rather than affording a hearing or giving DLC an opportunity to bring its practices into compliance with the law was improper.

The existence of absolute immunity here thus turns on whether Afdahl's decision to revoke DLC's lending licenses constitutes the "initiation of administrative proceedings" which would normally entitle an executive branch official to absolute immunity. The Eighth Circuit in Freeman I characterized the suspension of a license as the initiation of such proceedings. When viewing the revocation of DLC's licenses from a functional perspective, it would seem at first glance that Afdahl may be entitled to absolute immunity. There is little practical difference

---

[10] Alternatively, SDCL chapter 1-26 allows for any party to a "contested case" where a property right may be terminated to request a hearing before the OHE. SDCL § 1-26-18.3. This chapter also treats license proceedings as "contested cases." SDCL § 1-26-27
[11] As explained below, Afdahl had the authority to issue a cease and desist order without a hearing.

between a summary suspension of a license and the revocation which took place here; in both cases, the licensee is deprived of their license and has a right to seek redress through further administrative proceedings. See SDCL § 1-26-29 (requiring administrative proceedings to be "promptly instituted" to determine final action upon summary suspension of a license); SDCL § 1-26-30 (providing for judicial review of contested cases after the exhaustion of administrative remedies). Here, those proceedings would have provided DLC with an opportunity to "present . . . evidence to an impartial trier of fact and obtain independent judgment as to whether the prosecution is justified." Butz, 438 U.S. at 516. The outcome of those proceedings could then be appealed to the South Dakota Circuit Court, and ultimately the Supreme Court of South Dakota. See SDCL §§ 1-26-30.2; 1-26-37.

Despite the functional similarity between a license revocation and suspension, there are also significant differences. South Dakota law does not empower Afdahl to revoke a money lending license without adherence to the procedures prescribed in SDCL chapter 1-26, whereas Afdahl does have the authority to suspend a license in the absence of those procedures under certain circumstances. See SDCL § 1-26-29. Moreover, in contrast to a suspension, where South Dakota law requires that administrative proceedings be "promptly instituted" once the suspension is issued, Afdahl's revocation of DLC's licenses left it to DLC to take legal action. The very notice Afdahl provided to DLC indicated that "[a]ny person aggrieved by this order, may . . . file with the Division a written request for a hearing before the South Dakota Banking Commission." Doc. 10-1 at 12 (emphasis added). The revocation which took place here, therefore, is sufficiently distinct from a license suspension that it cannot properly be characterized as an "initiation of administrative proceedings" which would entitle Afdahl to absolute immunity.

Moreover, Afdahl's actions were not "related closely to [absolute] immunity's justifying purposes." Freeman I, 793 F.2d at 172. Just as the Eighth Circuit in Freeman I did not believe the extension of absolute immunity was needed to promote those justifying purposes, the same is true here. There is no reason to think Afdahl would be impeded from the vigorous exercise of his office if he is not entitled to absolute immunity for his conduct in this case, because that conduct went beyond the statutory authority vested in Afdahl by state law. In contrast, had Afdahl entered just a cease and desist order or a suspension order upon finding that public welfare imperatively required emergency action, absolute immunity would be justified based on the "desire to prevent the injustice of subjecting [Afdahl] to liability" for the exercise of the discretion required by the legal obligations of his position. Id. However, granting absolute immunity under circumstances where, as here, an agency official ignores or exceeds his authority would impermissibly insulate that official from the consequences of those actions. This result is contrary to the very justifying purposes which absolute immunity's application is meant to promote. Therefore, Afdahl is not entitled to absolute immunity for his decision to revoke DLC's lending licenses.

## B. Younger Abstention

Afdahl argues that this Court should invoke the Younger abstention doctrine and allow the state civil proceedings to conclude. Doc. 9 at 14–15. However, DLC is not seeking declaratory or injunctive relief from this Court that would "interfere with pending judicial proceedings" in the state system. Yamaha Motor Corp. U.S.A., v. Stroud, 179 F.3d 598, 603 (8th Cir. 1999). When the claim is for damages, "a federal court may not decline to exercise jurisdiction over them, unless the damages sought would require a declaration that a state statute is unconstitutional." Id. (internal citations omitted). DLC is not seeking to have this Court declare any state statute to be unconstitutional.

Afdahl relies on Yamaha to argue that a stay would be appropriate in this instance, as the Eighth Circuit directed in that particular case. Doc. 16 at 7. But in Yamaha, the viability of the plaintiff's damages claims was dependent upon the state court's determination of the constitutionality of a state statute, and thus the Eighth Circuit vacated the dismissal of the damages claims and directed the district court to stay, rather than dismiss, those claims. Id. at 603–04 ("In this case, Yamaha seeks compensatory and punitive damages for lost income allegedly arising from the unconstitutional impairment of its right to contract, and there may be viable claims remaining after conclusion of the state proceedings."). The state proceedings between DLC and the Division primarily focus on whether DLC's late fees are a "subterfuge" meant to violate the 36 percent APR set in SDCL § 54-4-44. That question does not determine DLC's claimed deprivation of procedural due process, and thus this case is distinguishable from Yamaha. Therefore, Younger abstention is inapplicable here and this Court must exercise jurisdiction over DLC's damages claims. Because neither the doctrine of absolute immunity nor Younger abstention is applicable here, Afdahl's motion to dismiss is denied.

### III. Cross Motions for Summary Judgment

DLC moved for partial summary judgment and Afdahl filed a cross motion for summary judgment. Doc. 13; Doc. 20. DLC argues entitlement to summary judgment because it was deprived of procedural due process as a matter of law and because Afdahl is not entitled to qualified immunity. In contrast, Afdahl argues entitlement to summary judgment because DLC received the process it was due and alternatively because he is entitled to qualified immunity, having not violated a clearly established right to which DLC was entitled. There are no genuine disputes of material fact that relate to these arguments. As the parties may seek an interlocutory

appeal on the issue of immunity, this Court addresses the sufficiency of the process arguments within the first prong of the qualified immunity analysis.

## A. Qualified Immunity

Determining if an official is entitled to qualified immunity involves a two-step inquiry: 1) whether the facts that plaintiff has shown make out a violation of a constitutional right; and 2) whether that constitutional right was "clearly established" at the time of the official's acts. Saucier v. Katz, 533 U.S. 194, 201 (2001). If the court finds that one of the two elements is not met, the court need not decide the other element, and a court may address the elements in any order it wishes "in light of the circumstances of the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

### 1. Step One: Constitutional Violation

"To establish a violation of procedural due process, [DLC] must [show] 1) [Afdahl] deprived [DLC] of life, liberty, or property; and 2) [Afdahl] deprived [DLC] of that interest without sufficient process." Clark v. Kansas City Mo. Sch. Dist., 375 F.3d 698, 701 (8th Cir. 2004) (citation and internal quotation marks omitted).

### a. Deprivation of Life, Liberty, or Property

"A protected property interest is a matter of state law involving 'a legitimate claim to entitlement as opposed to a mere subjective expectancy.'" Snaza v. City of Saint Paul, 548 F.3d 1178, 1182–83 (8th Cir. 2008) (quoting Bituminous Materials, Inc. v. Rice Cty., 126 F.3d 1068, 1070 (8th Cir. 1997)). Afdahl appears to argue that because the director has discretion under South Dakota law to issue licenses, DLC has a privilege to conduct state regulated business rather than a constitutionally protected right. Doc. 20 at 14–15. Curiously, Afdahl then appears to concede that DLC is to be afforded due process as a licensee. Doc. 20 at 15. This question warrants little

discussion; DLC had valid licenses which gave it a "legitimate claim to entitlement as opposed to a mere subjective expectancy," as reflected in the fact that South Dakota law mandates that licenses not be revoked without notice and opportunity to show compliance with the law in the absence of emergency circumstances. See SDCL § 1-26-29. Moreover, ample case law establishes that an issued license is a protected property interest. See, e.g., Bell v. Burson, 402 U.S. 535, 539 (1971) ("Once licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment."); Richardson v. Town of Eastover, 922 F.2d 1152, 1156 (4th Cir. 1991) ("A license issued by the state which can be suspended or revoked only upon a showing of cause creates a property interest protected by the Fourteenth Amendment."); C. Line, Inc. v. City of Davenport, 957 F. Supp. 2d 1012, 1036–37 (S.D. Iowa 2013) (finding a protected property interest where business had license to operate via a consent decree with municipality guaranteeing it would issue license to business despite its prior nonconforming use).

Afdahl issued the Order on September 13, 2017, requiring DLC to surrender its licenses to the Division. Doc. 10-1 at 7–12. Although he stayed his order on September 28, 2017, and allowed DLC to continue servicing loans originated before the enactment of IM 21, DLC was deprived of a protected property interest for at least 15 days in theory, if not in practice. [12] See Fuentes v. Shevin, 407 U.S. 67, 84–85 (1972) ("[I]t is now well settled that a temporary, nonfinal deprivation

---

[12] It appears that DLC did not surrender its licenses and was not required to do so once Afdahl issued the Stay. However, the Division twice emailed DLC before the issuance of the Stay to reaffirm that DLC was no longer licensed to lend money in South Dakota and insist on compliance with the Order, and also issued a public statement that DLC's licenses were being revoked.

of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment."). Thus, the first element of a procedural due process violation claim is met.

b. Sufficiency of Process

"Generally, where deprivations of property are authorized by an established state procedure, due process is held to require predeprivation notice and hearing in order to serve as a check on the possibility that a wrongful deprivation would occur." Keating v. Neb. Pub. Power Dist., 562 F.3d 923, 928 (8th Cir. 2009) (internal quotation marks and alterations omitted) (quoting Parratt v. Taylor, 451 U.S. 527, 538 (1981)). "Due process is a flexible concept, requiring only 'such procedural protections as the particular situation demands.'" Clark, 375 F.3d at 702 (quoting Mathews v. Eldridge, 424 U.S. 319, 334 (1976)). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews, 424 U.S. at 333 (citation and internal quotation marks omitted). A federal court must balance three factors originally articulated in Mathews to determine what kind of process is due:

> 1) the nature and weight of the private interest affected by the challenged official action; 2) the risk of an erroneous deprivation of such interest as a result of the summary procedures used; and 3) the governmental function involved and state interests served by such procedures, as well as the administrative and fiscal burdens, if any, that would result from the substitute procedures sought.

Hughes v. City of Cedar Rapids, 840 F.3d 987, 994 (8th Cir. 2016) (quoting Booker v. City of Saint Paul, 762 F.3d 730, 734 (8th Cir. 2014). DLC and Afdahl disagree on the results of this balancing test when applied to this case.

*Private Interest*

As explained above, DLC has a protected property interest in its money lending licenses and a substantial private interest in retaining the licenses. See Bell, 402 U.S. at 539 ("Once licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood.");

Ramsey v. Bd. of Educ. of Whitley Cnty, 844 F.2d 1268, 1273 (6th Cir. 1988) ("The Supreme Court has held repeatedly that the property interest in a person's means of livelihood is one of the most significant that an individual can possess."); see also Holt Bonding Co., Inc. v. Nichols, 988 F. Supp. 1232, 1241 (W.D. Ark. 1997) ("A professional bail bond company license may be essential in the pursuit of a person's livelihood and as such, should not be summarily suspended without notice and a hearing.").

*Risk of Erroneous Deprivation from Summary Procedures Used*

The parties dispute the magnitude of the risk that the summary procedures employed by Afdahl and the Division would result in an erroneous deprivation of DLC's interest. Afdahl argues that the target examination and the full scope examination provided a substantial evidentiary basis to conclude DLC was violating both the terms of its licenses and state law. Doc. 20 at 17. That may be true, yet the Mathews test does not evaluate if DLC's conduct actually violated state law to justify revocation of licensure but "the risk of an erroneous deprivation as a result of the summary procedures used." Hughes, 840 F.3d at 994. Here, the summary procedures for revocation used by Afdahl actually exceeded his statutory authority, casting doubt on the existence of procedural due process. See Keating, 562 F.3d at 928 ("Generally, where deprivations of property are authorized by an established state procedure, due process is held to require predeprivation notice and hearing in order to serve as a check on the possibility that a wrongful deprivation would occur.").

Meanwhile, DLC argues that the risk of erroneous deprivation was "incredibly high" because of the substantial disagreement over how to view the late fees associated with its signature loan product and whether those constitute a "device, subterfuge, or pretense" designed to evade

South Dakota's APR limitation.[13]  Doc. 13 at 10; Doc. 30 at 9–13.  DLC points out that there is no

controlling case law regarding the interpretation of SDCL §§ 54-4-44, 54-4-44.1, and 54-4-44.3,

and that it will be an issue of first impression when interpretation of these statutes is litigated in

the South Dakota state courts.  Doc. 30 at 10.  This legal uncertainty, according to DLC, means

that the risk of an erroneous deprivation was high.

This Court disagrees with DLC's assertion that risk of misinterpretation of the statutes

threatens an erroneous deprivation under the Mathews balancing test.  DLC is correct in that South

Dakota state courts have not ruled on the status of particular late fees and when they ought to be

considered in determining interest rates under SDCL §§ 54-4-44 and 54-4-44.1.  However, that

situation actually results in Afdahl being obligated to make some interpretation of the statutes.

SDCL §§ 51A-2-1 and 51A-2-3 establish the Division of Banking and place it under the

administrative control and supervision of the Director, and charge the Division and Director to

carry out the activities delineated in that title and others as prescribed by the South Dakota

Legislature.  The Legislature vested the Director with authority over licensing of money lenders

and empowered him to suspend and even revoke licenses when licensees engage in conduct that

---

[13] DLC does not argue that there was a high risk of an erroneous deprivation stemming from the
Division determining that DLC was issuing short term loans inconsistent with its license
applications. The Division had DLC's applications which all reflected that DLC was not issuing
short term loans and closely examined the signature loan product which appeared to be a short
term loan.  DLC instead contends that there is only one money lending license under which
applicants lend money pursuant to SDCL chapter 54-4, and that additional discovery is required
to ascertain the basis of Afdahl's contention that DLC was not licensed to issue short term loans.
Doc. 32 at ¶ 4.  In DLC's view, the discrepancy between its applications and the actual term of the
signature loan product does not amount to a violation of its licenses.  South Dakota law, however,
specifically identifies applications containing statements which are "false or misleading with
respect to any material fact" as good cause to revoke a money lending license.  SDCL § 54-4-49.
There is no question that DLC's applications indicated it would not make short term loans, and
there appears to be no question that DLC's new 2017 signature loan product was a short term loan
under SDCL § 54-4-36(16).

violates South Dakota law. See SDCL §§ 54-4-48 (vesting the Director with the power to issue cease and desist orders); 54-4-49 (vesting the Director with authority to suspend, revoke, or deny renewal of licenses for good cause subject to SDCL chapter 1-26). In the absence of binding state court precedent interpreting the relevant statutes, Afdahl is required to make an interpretation of whether DLC is using late fees and a short term loan product to violate IM 21 and SDCL §§ 54-4-44 and 54-4-44.1, and appeal of his ruling is the proper procedure to lead to state court interpretation of those statutes.

DLC believes that Afdahl should have provided DLC a contested hearing on these legal issues. However, while a hearing in front of the Banking Commission[14] or OHE may have provided DLC an opportunity to repeat or hone the legal argument its attorney Morehead made in writing, Afdahl remains the one under SDCL §§ 54-4-48 and 54-4-49 and SDCL chapter 51A-2 to make certain applications of law, and there was no disputed fact to present to the Banking Commission or OHE. As detailed above, before taking adverse administrative action the Division conducted an extensive examination procedure including the target and full scope examinations. The Division reviewed DLC's OTM regarding the signature loan product and examined hundreds of loans themselves. Moreover, in response to the Division's follow-up questions, DLC provided to the Division a lengthy legal analysis laying out its argument as to why the late fees associated with its signature loan product did not constitute a finance charge which must be included in the calculation of the APR. See Doc. 22-20 at 2–6. DLC does not allege that the Division lacked a

---

[14] The Banking Commission is composed of five members who are appointed to three year terms by the governor of South Dakota, with the Director of the Division acting as the executive officer of the Commission who complies with and enforces the orders of the Commission. SDCL § 51A-2-7.

factual foundation to make its determination, but instead argues that the legal conclusion derived from those facts is incorrect.[15]

In this particular instance where no binding legal precedent exists interpreting SDCL § 54-4-44.1 as to what constitutes a "device, subterfuge, or pretense" meant to evade South Dakota's 36 percent APR limitation, it necessarily would be Afdahl's responsibility to make an initial interpretation. His initial interpretation could be overturned in state court, but that is a different type of error than what predeprivation process is meant to protect against. The procedures employed by Afdahl and the Division provided him with a substantial factual foundation upon which to base his legal conclusion that DLC was violating state law and thus would have supported issuance of a cease and desist order. DLC was able to submit its legal argument regarding the late fees, just as it would have done in a contested hearing. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985) ("The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement."). The Division collected substantial, quality evidence by examining records produced by DLC, DLC's own OTM, and seeking information directly from DLC's regional manager and counsel. As the Supreme Court has stated, "[t]he Due Process Clause simply does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations." Mackey v. Montrym, 443 U.S. 1, 13 (1979).

---

[15] To be sure, DLC does emphasize that it has not had the opportunity to analyze the data used by the Division to reach its conclusion, but concedes that this data is irrelevant to the question of its right to due process. Doc. 30 at 9 n.4. DLC is not disputing the reliability of the data examined by the Division, which of course was supplied by DLC. That DLC perhaps has not analyzed the same data does not mean that the risk of an erroneous deprivation has been appreciably increased; the Division's examination of the data sufficiently reduces the risk that they would take adverse administrative action against DLC's property interest on an erroneous factual basis. DLC's dispute is with the Division's legal conclusion, not the facts themselves.

In short, this situation is an unusual one in which to evaluate "the risk of an erroneous deprivation [of DLC's money lending licenses] as a result of the summary procedures used." Hughes, 840 F.3d at 994. The procedures were sufficient to allow Afdahl to take action within his statutory authority, such as issuing a cease and desist order under SDCL § 54-4-48 or notifying DLC of a suspension or possible revocation of licenses subject to the procedures of SDCL chapter 1-26. However, Afdahl disregarding the procedures of SDCL chapter 1-26 and exceeding his statutory authority to unilaterally revoke the licenses does involve a "risk of erroneous deprivation . . . as a result of the summary procedures used," even if that risk was a bit theoretical in nature given Afdahl's statutory discretion to apply South Dakota banking law.

*Government Interest Served by Procedures and Possible Substitute Procedures*

Both parties agree that there is a government interest in the appropriate regulation of money lending licenses. Doc. 20 at 18; Doc. 13 at 11; Doc. 30 at 13; see also Bowlby v. City of Aberdeen, 681 F.3d 215, 221 (5th Cir. 2012) (noting that a city government has "a strong interest in properly regulating businesses"). SDCL chapter 54-4 regulates money lenders, and the voters of South Dakota adopted stricter regulations on money lenders when they approved IM 21. The fact that DLC reports certain loan activity, such as late payments and defaults, to consumer reporting agencies which can negatively impact the credit of South Dakotans heightens the state interest in ensuring consumers are protected from unlawful lending practices. A state of course has an interest in protecting its citizens from predatory lending practices.

The substitute procedures that DLC urges, which would be the hearing process set out in South Dakota law, do not involve additional administrative and fiscal burdens that are overly burdensome. SDCL § 54-4-49 mandates no revocation of a license occur without a hearing, which suggests that South Dakota has determined those additional administrative and fiscal burdens

29

attendant to the hearing process to be commensurate with the interests involved. Furthermore, the state interests were not appreciably advanced by Afdahl's decision to forgo the procedures laid out in statute. As even DLC concedes, Afdahl could have protected South Dakota borrowers by invoking his authority to issue a cease and desist order to halt DLC lending while simultaneously adhering to the regular, statutorily prescribed procedures for possible suspension or revocation.

Having examined each factor, this Court concludes that Afdahl's Order of September 13, 2017, did not provide DLC adequate notice and "the opportunity to be heard at a meaningful time and in a meaningful manner" as to the revocation of DLC's lending licenses. Mathews, 424 U.S. at 333 (internal citation and quotation marks omitted). First, the procedures employed by the Division ultimately failed to provide adequate notice of revocation to DLC of the apparent violations which formed the basis of Afdahl's decision to issue the Order. Afdahl's Order was based on two primary transgressions on the part of DLC: that DLC was making short term loans which it was not licensed to do, and that DLC's late fees were a "device, subterfuge, or pretense" designed to evade South Dakota's APR limitation. Doc. 10-1 at 10–11. The Division had notified DLC in its first correspondence that it viewed the late fees with suspicion as possibly designed to evade the requirements of SDCL § 54-4-44, and indicated that it would conduct an examination of DLC. See Doc. 22-13. DLC also acknowledged the Division's apparent belief that its signature loan product was violating state law in its August 15, 2017, letter. Doc. 22-20 at 2 ("DLC assumes this [the public discussions regarding the legality of DLC's signature loan product under IM 21 and its amendments] is at least one reason the Division has taken such an interest in the Signature Loan Product, and will now conduct a second examination in a little over 30 days' time, after conducting few, if any, during DLC's first seven years of operations."). Although DLC was certainly alerted to the Division's suspicions, DLC received no notice that the Division had

concluded DLC's late fees violated state law justifying revocation of DLC's money lending licenses until Afdahl issued the Order. The Division provided no notice whatsoever to DLC regarding the apparent violation of its licenses by making short term loans before the issuance of the Order. While adequate notice is a flexible concept, a total absence of notice regarding one of the two primary bases for revocation of DLC's licenses does not satisfy the requirements of due process. See, e.g., In re Ruffalo, 390 U.S. 544, 550–51 (1968) (holding that an "absence of fair notice" in disbarment proceedings violated lawyer's due process rights where additional charges were filed against him after he had testified as to material facts regarding that charge); In re Gault, 387 U.S. 1, 33 (1967) ("Notice, to comply with due process requirements, . . . must set forth the alleged misconduct with particularity.") (internal quotation marks omitted). DLC provided its new loan contract to the Division on June 21, 2017, and the Division conducted its target examination on July 13, 2017, where it had the opportunity to scrutinize the signature loan product. The Division must have known well in advance of Afdahl's Order that it had deemed DLC to be issuing short term loans, yet at no point was DLC advised of this violation prior to the issuance of the Order. Such an absence of notice for revocation does not comport with due process.[16]

---

[16] This Court is mindful of one district court decision to the contrary, but believes that decision to be distinguishable from this revocation and more akin to supporting no prior notice for a cease and desist order. See Gray v. City of Valley Park, 4:07-cv-00881-ERW, 2008 U.S. Dist. LEXIS 7238, at *87 (E.D. Mo. Jan. 31, 2008) (finding a municipal ordinance concerning undocumented workers provided notice of standards of compliance where ordinance made clear what conduct would place persons in violation of the ordinance, how the ordinance would be enforced, and what procedures a business found to be in violation of the ordinance should follow). SDCL § 54-4-40, which establishes the content of an application for a money lending license, reads in relevant part that "[t]he application shall contain . . . other information the director may consider necessary." SDCL § 54-4-40. Section 5 of the South Dakota money lender's license application requires an applicant to state whether they provide short term consumer loans as defined in SDCL § 54-4-36, and then provides a box to check yes or no. See Docs. 22-2, 22-3, 22-4, 22-5, 22-6, 22-7, 22-8, 22-9. The application further states that "applicant[s] must without inquiry from the Division, supplement and update the information herein provided as may from time to time be necessary." South Dakota law further defines "good cause" for purposes of revoking a money lender's license, which

Second, Afdahl's Order did not give DLC a meaningful opportunity to be heard concerning the revocation of its licenses. Afdahl's Order provided DLC no chance to bring its lending practices in conformity with its approved licenses or to rework its loan product, nor even the opportunity to receive an explanation from the Division as to why those would not be acceptable courses of action. This is precisely what South Dakota law normally requires before the revocation of a license. See SDCL § 1-26-29. Although the violation of state law does not by itself amount to a due process violation, those "substitute procedures" and the burdens associated with them must be weighed in balancing the Mathews factors. Afdahl cannot credibly claim that state interests were well served by the initial Order revoking DLC's licenses without providing DLC the procedural protections in SDCL chapter 1-26, when Afdahl had the alternative course of less drastic action such as a cease and desist order.

DLC did have a more meaningful opportunity to be heard on the issue of DLC's late fees being included in the calculation of the APR. Based on its presumption that the Division believed

---

includes instances where "[t]he licensee has filed an application for a license which, as of the date the license was issued, or as of the date of an order denying, suspending, or revoking a license, was incomplete in any material respect or contained any statement that was, in light of the circumstances under which it was made, false or misleading with respect to any material fact." SDCL § 54-4-49(7). DLC had submitted several applications and renewal applications during the time it conducted business in South Dakota, and had to affirmatively represent that it did not issue short term loans. Thus it could be argued that DLC had constructive notice of the violation of its applications by virtue of the statutory framework in place. However, the district court's analysis regarding notice in Gray was in response to the plaintiffs' challenge that the ordinance itself was unconstitutional because it failed to provide notice of standards and guidance for compliance. 2008 U.S. Dist. Lexis at *84–85. Indeed, the plaintiffs also alleged that the ordinance did not provide for predeprivation procedures, but the district court rejected that argument because under the ordinance's scheme, the city would request documentation regarding an alleged undocumented worker, and the business was provided three days to provide that documentation. Id. at *89–91. Thus, Gray is distinguishable because the notice provided by the text of the ordinance itself was sufficient to defeat a constitutional challenge to that ordinance; however that did not grant the city a free hand to revoke business licenses without providing some type of notice regarding an apparent violation of the ordinance.

DLC's late fees violated SDCL §§ 54-4-44 and 54-4-44.1, DLC provided a written legal analysis arguing to the contrary. See Doc. 22-20 at 2–6. The opportunity for DLC to submit this argument before the revocation of its licenses weighs in Afdahl's favor. See Loudermill, 470 U.S. at 546 ("The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement."). However, "[i]n general, procedural due process requires that a hearing before an impartial decision maker be provided . . . prior to a governmental decision which deprives individuals of a liberty or property interest." Samuels v. Meriweather, 94 F.3d 1163, 1166 (8th Cir. 1996) (citing Mathews, 424 U.S. at 332–33). Under state law, DLC was entitled to a contested hearing before the OHE before the revocation of its licenses. Here again, the state law violation, while not dispositive, weighs in the balancing of the Mathews factors because such "substitute procedures" and their associated burdens would not have diminished the state's interests in a meaningful way but certainly would have advanced those of DLC by allowing it the chance to argue its case to an "impartial decisionmaker" at the OHE.

Afdahl argues that due process does not require that a "trial-like evidentiary hearing" be provided to DLC. Indeed, "the Supreme Court has recognized the ordinary principle that something less than an evidentiary hearing may be sufficient prior to adverse administrative action." Mickelson v. Cty of Ramsey, 823 F.3d 918, 926 (8th Cir. 2016) (alterations omitted) (citations and internal quotation marks omitted). Relatedly, the opportunity for a full administrative hearing and judicial review as post-deprivation procedures factors into the consideration of whether procedural due process exists. See Loudermill, 470 U.S. at 547 n.12 ("[T]he existence of post-termination procedures is relevant to the necessary scope of pre-termination procedures."). Ultimately, "[t]he 'content of the notice and the nature of the hearing' required by the Due Process Clause 'depend[s] on appropriate accommodation of the competing

[governmental and private] interests involved.'" Soltesz v. Rushmore Plaza Civic Ctr., 863 F. Supp. 2d 861, 886 (D.S.D. 2012) (alterations in original) (quoting Goss v. Lopez, 419 U.S. 565, 579 (1975)). Afdahl's unilateral revocation of DLC's lending licenses failed to appropriately accommodate these competing interests. As explained above, DLC received *no* notice and *no* opportunity to be heard regarding one of the two primary issues which prompted Afdahl's decision to revoke DLC's licenses, and the informal notice to DLC prompting DLC to submit a written legal argument regarding treatment of the late fees is insufficient on its own to cure the constitutionally deficient process. In short, Afdahl's Order did not meaningfully advance the interests of the state (and indeed contravened state law), and the "substitute procedures" sought by DLC (and required under state law) would have accommodated the competing interests, provided due process, and not needlessly compromised the private interests of DLC. Afdahl's Order of September 13, 2017, revoking the licenses before giving DLC meaningful notice and a meaningful opportunity to be heard deprived DLC of its constitutionally guaranteed right to due process.

### c. Quick Action Exception

Afdahl argues that, in the alternative, his actions were justified based on the necessity of quick action by the state to protect the public from further harm. Doc. 20 at 21–22 (citing Keating, 562 F.3d at 928–29). The quick action exception to the general requirement of predeprivation process is applied in a narrow set of circumstances. See e.g., Mackey, 443 U.S. at 18–19 (upholding a state statute that allowed for prehearing suspension of a driver's license for refusing to take a breath test upon arrest for operating a motor vehicle while under the influence of alcohol). The Eighth Circuit's discussion of the concept of quick state action in Freeman I demonstrates its inapplicability to this case. In examining two Supreme Court cases dealing with the suspension of drivers licenses, the Eighth Circuit noted that in Mackey the governmental interest in protecting

the public from drunk driving outweighed the risk of an erroneous deprivation, and thus that a predeprivation hearing was not required before suspending the license of someone who presumably drove while drunk. Freeman I, 793 F.2d at 177 n.12. However, a predeprivation hearing was required in Bell where a state law allowed for the suspension of the drivers licenses of motorists involved in vehicular accidents, unless they could furnish security to cover the amount of damages claimed by the aggrieved party in the accident or proof of financial responsibility. Freeman I, 793 F.3d at 177 n.12. In Bell, the threat to public safety was not sufficient to justify the increased risk of an erroneous deprivation which accompanies state action without a predeprivation hearing, thus a predeprivation hearing was required in order to determine whether a reasonable possibility of a judgment for damages arising from the motor vehicle accident existed against motorists before the suspension of their drivers licenses. Id.

Afdahl points out that in the few short weeks DLC had been offering its new signature loan product, 633 loans deemed by the Division to violate state law had been originated by DLC and that holding a "trial-like evidentiary hearing" was impracticable because it would have allowed DLC to continue originating and servicing these loans. Doc. 20 at 21–22. While it is certainly true that the state, and by extension the Division, has a substantial interest in protecting the public from illegal lending practices, Afdahl mischaracterizes his options. State law provides him the power to issue a cease and desist order without a hearing to halt any lending practice that is not in conformity with any state or federal statute, rule, or regulation. See SDCL § 54-4-48. Afdahl also could have suspended DLC's licenses upon a finding that "public health, safety, or welfare imperatively require emergency action," but made no such finding in the Order. See SDCL § 1-26-29. Afdahl had the power to prevent DLC from originating any further loans without the

35

revocation depriving DLC of its property interest in its licenses without a hearing. He cannot, therefore, invoke the quick action exception.

Indeed, Afdahl's own actions after he issued his Order further establish that the quick action exception does not apply. When Afdahl stayed his Order on September 28, 2017, and subsequently on October 3, 2017, gave notice of a hearing, he essentially transformed the Order into a cease and desist order, and it appears that DLC remains in possession of its licenses at this time. If a cease and desist order was sufficient on September 28, 2017, it certainly was a viable option on September 13, 2017, when Afdahl issued the initial Order revoking DLC's licenses. Any need to protect the public from further harm could have been achieved without revoking the licenses and compromising DLC's protected property interest, and thus the quick action doctrine does not shelter Afdahl's Order from a procedural due process challenge.

    *2. Step Two: Clearly Established Right*

Because DLC was deprived of a constitutional right at least for 15 days when its lending licenses were revoked, Afdahl can claim the protection of qualified immunity only if that right was not "clearly established." <u>Saucier</u>, 533 U.S. at 201. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Stanton v. Sims</u>, 571 U.S. 3, 6 (2013) (per curiam) (quoting <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 743 (2011)). Qualified immunity does not require there be a case directly on point before concluding that the law is clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate." <u>Stanton</u>, 571 U.S. at 6. "In order to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right[,]" and "[r]eciting an abstract right at a high level of generality will not suffice."

36

Ehlers v. City of Rapid City, 846 F.3d 1002, 1008 (8th Cir. 2017) (citations, alteration, and internal quotations omitted). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007) (citation omitted).

Afdahl cannot claim the protection of qualified immunity because relevant precedent clearly establishes the right to a predeprivation hearing before the revocation of a business license. See Freeman II, 862 F.2d at 1332 (rejecting qualified immunity for defendants who had suspended a business license without a predeprivation hearing). However, Afdahl disputes that Freeman II closes the door on his claim to qualified immunity, arguing that while a predeprivation hearing is required, the "extent of due process" that DLC was entitled to is not clearly established. Doc. 35 at 8. This Court disagrees with Afdahl's gloss on Freeman II.

After the Supreme Court remanded Freeman I, the Eighth Circuit reaffirmed the relevant section in Freeman I which denied summary judgment to the defendants on the basis of qualified immunity with respect to the plaintiffs' claims regarding the lack of a predeprivation hearing. Freeman II, 862 F.2d at 1332. In reinstating that section of its previous opinion, the Eighth Circuit commented that objectively reasonable officials could not have believed it was constitutionally permissible to issue a summary suspension of the business license at issue in that case without a predeprivation hearing where the defendants had no factual basis to justify invoking the public welfare exception to the predeprivation hearing requirement. Id. The Eighth Circuit further commented that it had "no doubt that the law to the contrary was clearly established, especially in view of the fact that defendants have made no showing that a predeprivation hearing was impracticable or impossible—which it obviously was not." Id. This Court thus concludes that Eighth Circuit precedent clearly establishes the right to a predeprivation hearing before summary

suspension or revocation of a business license absent exigent circumstances making such a hearing impracticable or impossible.

Afdahl believes the Freeman cases are distinguishable and clearly establish only that "a pre-deprivation hearing for a business license is required if the official taking action has no facts justifying his action and such action is based upon the merest suspicion that such facts might exist." Doc. 35 at 9. Contrary to Afdahl's argument, the right to a predeprivation hearing before the revocation of a business license is well established, and only reinforced by Freeman I and Freeman II. See e.g., Zinermon v. Burch, 494 U.S. 113, 132 (1990) ("In situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking."); C. Line, Inc., 957 F. Supp. 2d at 1038 ("[Plaintiff] . . . was entitled to notice and a hearing *before* Defendants revoked its license/nonconforming use . . . ."); Holt Bonding Co., 988 F. Supp. at 1240–41 (holding that a bonding company was entitled to a predeprivation hearing prior to the suspension of its license).

Afdahl also contends that the "extent of due process" to which DLC was entitled is not clearly established. While Freeman does not clearly establish the right to an adversarial evidentiary hearing, that does not mean the extent of process due to DLC is not clearly established. When a predeprivation hearing is required before adverse administrative action, that means simply that process sufficient to satisfy the due process requirements of the Fourteenth Amendment must be provided. See, e.g., Mackey, 443 U.S. at 13 ("[E]ven though our legal tradition regards the adversary process as the best means of ascertaining truth and minimizing the risk of error, the ordinary principle established by our prior decisions is that something less than an evidentiary hearing is sufficient prior to adverse administrative action) (citation and internal quotation marks omitted). A standard set of procedures to satisfy these requirements has not been articulated

because "[d]ue process is a flexible concept, requiring only 'such procedural protections as the particular situation demands.'" Clark, 375 F.3d at 702 (quoting Mathews, 424 U.S. at 334). That such procedures have not been articulated does not mean that the right to a predeprivation hearing is an "abstract right" recited "at a high level of generality." Ehlers, 846 F.3d at 1008. There is a clearly established right to a predeprivation hearing before the revocation of a business license absent exigent circumstances. Notwithstanding Afdahl's arguments, due process *always* requires "the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews, 424 U.S. at 333. Afdahl failed to provide DLC with predeprivation notice of revocation and a hearing to satisfy this clearly established constitutional mandate, thus he cannot now claim the protection of qualified immunity. As such, DLC is entitled to partial summary judgment as to the revocation for the 15 day period between Afdahl's Order and the time when Afdahl corrected his error to the lending licenses and set a hearing date.

## IV. Damages Claim

Although DLC has prevailed on its claimed constitutional deprivation for the 15-day period of revocation, its damages appear to be limited in this case. "[W]hen § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306 (1986). Therefore, DLC must establish that the procedural due process violation has caused actual injury before substantial compensatory damages may be recovered. See Brewer v. Chauvin, 938 F.2d 860, 864 (8th Cir. 1991) (en banc) ("Damages therefore must be limited to those caused by the due process violation."). Despite the typical requirement that damages be premised upon proof of actual injury, the Supreme Court has determined that "the right to procedural due process is 'absolute' in the sense that it does not

depend upon the merits of a claimant's substantive assertions" and held that "the denial of procedural due process should be actionable for nominal damages without proof of actual injury." Carey v. Piphus, 435 U.S. 247, 266 (1978). In addition, this Court has the discretion to award "a reasonable attorney's fee" to a prevailing party in an action to enforce a constitutional right under section 1983. 42 U.S.C. § 1988(b).

Afdahl's Order was issued on September 13, 2017, but was stayed on September 28, 2017, and was followed by a notice of hearing dated October 3, 2017. In essence, DLC was deprived of its protected property interest for 15 days, at which point Afdahl took action to try to correct the procedural shortcoming. DLC contends that because of Afdahl's actions, "[i]ts doors have already closed, its employees have already lost their jobs, and its reputation as a lawful business has already been shattered without a hearing." Doc. 13 at 14. Indeed, DLC claims Afdahl's failure to provide a predeprivation hearing has "effectively wiped [DLC] off the map in South Dakota." Doc. 14 at 14. But the notion that DLC's ability to do business in South Dakota was destroyed as a result of Afdahl's actions strains credulity in light of the fact that it was IM 21 that ended the bulk of DLC's lending business in South Dakota and prompted DLC's owner to very publicly shutter most of DLC's operations in South Dakota. DLC has strenuously objected to Afdahl's conclusion that its late fees violated South Dakota law, but as of yet DLC has not chosen to pursue further administrative proceedings to seek to validate its argument and regain the ability to issue its signature loan product.[17] DLC has a duty to mitigate damages in this § 1983 case, Meyers v. City

---

[17] DLC instead has filed an appeal of Afdahl's Order in the Sixth Judicial Circuit Court of South Dakota arguing that it constitutes a final agency action. Doc. 10-2. That appeal was dismissed by the Sixth Judicial Circuit Court and DLC has appealed that decision to the Supreme Court of South Dakota. Prior to that filing, DLC requested to continue the hearing that was set before the OHE. Doc. 10-6 at 2.

of Cincinnati, 14 F.3d 1115, 1119 (6th Cir. 1994), and its decision to forgo those administrative proceedings calls into question whether DLC has sought to mitigate damages.

Afdahl had the authority to halt the issuance of DLC's signature loan product via a cease and desist order. Had he done so, procedural due process concerns would not have been implicated, DLC would have no claim to seek damages under § 1983, and its remedy would have been further administrative proceedings challenging Afdahl's decision, unless it chose to abandon or substantially alter the signature loan product. The practical consequence of Afdahl's Order and subsequent Stay have essentially brought DLC, fifteen days after the revocation, close to where it would have been if Afdahl issued a cease and desist order in the first place. Thus, although this Court grants summary judgment for DLC on the violation of procedural due process for the fifteen day period between September 13 and September 28, 2017, nothing in this opinion should be taken as an endorsement of the extent of DLC's damages claims.

V.    **Conclusion**

For the reasons stated above, it is hereby

ORDERED that Afdahl's motion to dismiss, Doc. 8, is denied. It is further

ORDERED that DLC's motion for partial summary judgment, Doc. 11, is granted in part with respect to the 15 day period of revocation from September 13 to September 28, 2017, and Afdahl's cross motion for summary judgment, Doc. 19, is denied.

DATED this ___29th___ day of May, 2018.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

41